1
2
3
4
5
6
7
8
9

# UNITED STATES DISTRICT COURT

## EASTERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| RODGER DALE ALLEY, JR., | 1:11-CV-01444 LJO GSA HC |
| Petitioner, | FINDINGS AND RECOMMENDATION REGARDING PETITION FOR WRIT OF HABEAS CORPUS |
| v. | |
| BRENDA CASH, Warden, | |
| Respondent. | |

Petitioner is a state prisoner proceeding pro se with a petition for writ of habeas corpus pursuant to 28 U.S.C. § 2254.

## BACKGROUND

Petitioner is currently in the custody of the California Department of Corrections pursuant to a judgment of the Superior Court of California, County of Fresno, following his conviction by jury trial on June 12, 2008, of first degree murder.  (CT[1] 1352.)  The jury also found true enhancements for having served prior prison terms.  (CT 1352.)  On July 28, 2008, Petitioner was sentenced to an indeterminate prison term of twenty-seven years to life.  (CT 1352.)

Petitioner filed a timely notice of appeal.  On May 11, 2010, the California Court of Appeal, Fifth Appellate District ("Fifth DCA"), affirmed the judgment.  (See Lodged Doc. No. 4.) Petitioner filed a petition for review in the California Supreme Court.  (See Lodged Doc. No. 5.)

---

[1]"CT" refers to the Clerk's Transcript on Appeal.

1    On September 1, 2010, the petition was summarily denied.  (See Lodged Doc. No. 6.)

2        On July 8, 2011, Petitioner filed the instant federal habeas petition.  He presents five (5)

3    grounds for relief: 1) The conspiracy instruction given allowed the jury to convict Petitioner of

4    murder on the basis of an agreement after the fact, violating Petitioner's constitutional rights; 2)

5    The trial court deprived Petitioner of due process and a fair trial in violation of his constitutional

6    rights when it provided extemporaneous instructions on reasonable doubt, the prosecution's

7    burden of proof, and the presumption of innocence; 3) The shackling of Petitioner violated his

8    right to self-representation, due process and a fair trial; 4) The trial court's requirement that

9    Petitioner provide testimony in a question-answer format, rather than a narrative, unduly

10   burdened his right to testify in violation of his constitutional rights; and 5) Petitioner was denied

11   his right to counsel in violation of his constitutional rights.  On November 10, 2011, Respondent

12   filed an answer to the petition.  On December 15, 2011, Petitioner filed a traverse.

### STATEMENT OF FACTS[2]

On June 12, 2006, the body of Courtney Rice was discovered in the bed of an
abandoned pickup truck at a tow yard in Fresno. Subsequently, appellant, Enrique Lopez,
Michelle Dolores Molina, and Albert Joseph Vargas (collectively, the defendants) were
charged with murder (Pen.Code, § 187),[FN2] forcible rape (§ 261, subd. (a)(2)), attempted
forcible rape (§§ 664/261, subd. (a)(2)), and false imprisonment by violence (§ 236) with
a number of special circumstance and sentence enhancement allegations.

FN2. Further statutory references are to the Penal Code unless otherwise
specified.

On January 8, 2008, the case went to trial. The prosecution presented evidence to
support its theory that Rice, who worked as a prostitute for Lopez, was bound and
gagged, raped, and killed by the defendants inside Molina's apartment because Lopez
accused her of being a snitch or informer. The prosecution also presented evidence to
show the crimes were committed for the benefit of the Bulldogs criminal street gang.

On February 21, 2008, the jury returned its verdicts. As relevant here, the jury
found appellant not guilty of rape and attempted rape but was unable to reach verdicts and
the court declared a mistrial as to the murder and false imprisonment charges.

On May 12, 2008, appellant's second trial began. In pretrial motions, appellant
moved to represent himself and appear at trial without physical restraints. The trial court
granted appellant's motion to represent himself and appointed appellant's attorney from
his first trial as standby counsel. However, the court denied appellant's motion to appear
without physical restraints and required him to be tethered to his chair during trial except

27

28   [2]The Fifth DCA's summary of the facts in its May 11, 2010, opinion is presumed correct. 28 U.S.C.
§§ 2254(d)(2), (e)(1).

during jury voir dire. The court indicated that, during voir dire, appellant would be permitted to appear without restraints and move to a limited degree between counsel tables.

During the second trial, appellant testified on his own behalf, called several witnesses, and presented cellular phone records and other evidence to support his claim that he did not kill Rice and was not present at Molina's apartment when the alleged crimes took place. Appellant also claimed he did not help move or dispose of Rice's body, although he initially agreed to help after he learned she was deceased.

On June 12, 2008, the jury returned its verdicts, finding defendant guilty of first degree murder but not guilty of false imprisonment. The jury also returned not true findings on the gang enhancement and gang special circumstance contained in the murder count.

(See Lodged Doc. No. 4.)

## DISCUSSION

I.   Jurisdiction

Relief by way of a petition for writ of habeas corpus extends to a person in custody pursuant to the judgment of a state court if the custody is in violation of the Constitution or laws or treaties of the United States.  28 U.S.C. § 2254(a); 28 U.S.C. § 2241(c)(3); Williams v. Taylor, 529 U.S. 362, 375, n.7 (2000).  Petitioner asserts that he suffered violations of his rights as guaranteed by the U.S. Constitution.  The challenged conviction arises out of Fresno County Superior Court, which is located within the jurisdiction of this Court.  28 U.S.C. § 2254(a); 2241(d).

On April 24, 1996, Congress enacted the Antiterrorism and Effective Death Penalty Act of 1996 ("AEDPA"), which applies to all petitions for writ of habeas corpus filed after its enactment. Lockyer v. Andrade, 538 U.S. 63, 70 (2003); Lindh v. Murphy, 521 U.S. 320, 117 S.Ct. 2059, 2063 (1997); Jeffries v. Wood, 114 F.3d 1484, 1499 (9th Cir. 1997), cert. denied, 522 U.S. 1008 (1997), quoting Drinkard v. Johnson, 97 F.3d 751, 769 (5th Cir.1996), cert. denied, 520 U.S. 1107 (1997), overruled on other grounds by Lindh v. Murphy, 521 U.S. 320 (1997) (holding AEDPA only applicable to cases filed after statute's enactment).  The instant petition was filed after the enactment of the AEDPA and is therefore governed by its provisions.

II.   Standard of Review

Under the AEDPA, relitigation of any claim adjudicated on the merits in state court is

barred unless a petitioner can show that the state court's adjudication of his claim:

> (1) resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States; or

> (2) resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding.

28 U.S.C. § 2254(d); Harrington v. Richter, __ U.S. __, __, 131 S.Ct 770, 784, 178 L.Ed.2d 624 (2011); Lockyer, 538 U.S. at 70-71; Williams, 529 U.S. at 413.

As a threshold matter, this Court must "first decide what constitutes 'clearly established Federal law, as determined by the Supreme Court of the United States.'" Lockyer, 538 U.S. at 71, *quoting* 28 U.S.C. § 2254(d)(1).  In ascertaining what is "clearly established Federal law," this Court must look to the "holdings, as opposed to the dicta, of [the Supreme Court's] decisions as of the time of the relevant state-court decision." Williams, 592 U.S. at 412. "In other words, 'clearly established Federal law' under § 2254(d)(1) is the governing legal principle or principles set forth by the Supreme Court at the time the state court renders its decision." Id.  In addition, the Supreme Court decision must "'squarely address [] the issue in th[e] case' or establish a legal principle that 'clearly extend[s]' to a new context to the extent required by the Supreme Court in . . . recent decisions"; otherwise, there is no clearly established Federal law for purposes of review under AEDPA. Moses v. Payne, 555 F.3d 742, 754 (9th Cir.2009), *quoting* Wright v. Van Patten, 552 U.S. 120, 125 (2008); see Panetti v. Quarterman, 551 U.S. 930 (2007); Carey v. Musladin, 549 U.S. 70 (2006).  If no clearly established Federal law exists, the inquiry is at an end and the Court must defer to the state court's decision. Carey, 549 U.S. 70; Wright, 552 U.S. at 126; Moses, 555 F.3d at 760.

If the Court determines there is governing clearly established Federal law, the Court must then consider whether the state court's decision was "contrary to, or involved an unreasonable application of," [the] clearly established Federal law." Lockyer, 538 U.S. at 72, *quoting* 28 U.S.C. § 2254(d)(1). "Under the 'contrary to' clause, a federal habeas court may grant the writ if the state court arrives at a conclusion opposite to that reached by [the Supreme] Court on a question of law or if the state court decides a case differently than [the] Court has on a set of

materially indistinguishable facts." <u>Williams</u>, 529 U.S. at 412-13; <u>see also</u> <u>Lockyer</u>, 538 U.S. at 72. "The word 'contrary' is commonly understood to mean 'diametrically different,' 'opposite in character or nature,' or 'mutually opposed.'" <u>Williams</u>, 529 U.S. at 405, *quoting* Webster's Third New International Dictionary 495 (1976). "A state-court decision will certainly be contrary to [Supreme Court] clearly established precedent if the state court applies a rule that contradicts the governing law set forth in [Supreme Court] cases." <u>Id</u>. If the state court decision is "contrary to" clearly established Supreme Court precedent, the state decision is reviewed under the pre-AEDPA de novo standard. <u>Frantz v. Hazey</u>, 533 F.3d 724, 735 (9th Cir.2008) (en banc).

"Under the 'reasonable application clause,' a federal habeas court may grant the writ if the state court identifies the correct governing legal principle from [the] Court's decisions but unreasonably applies that principle to the facts of the prisoner's case." <u>Williams</u>, 529 U.S. at 413. "[A] federal court may not issue the writ simply because the court concludes in its independent judgment that the relevant state court decision applied clearly established federal law erroneously or incorrectly.  Rather, that application must also be unreasonable." <u>Id</u>. at 411; <u>see also</u> <u>Lockyer</u>, 538 U.S. at 75-76.  The writ may issue only "where there is no possibility fairminded jurists could disagree that the state court's decision conflicts with [the Supreme Court's] precedents." <u>Harrington</u>, 131 S.Ct. at 784.  In other words, so long as fairminded jurists could disagree on the correctness of the state courts decision, the decision cannot be considered unreasonable. <u>Id</u>. If the Court determines that the state court decision is objectively unreasonable, and the error is not structural, habeas relief is nonetheless unavailable unless the error had a substantial and injurious effect on the verdict.  <u>Brecht v. Abrahamson</u>, 507 U.S. 619, 637 (1993).

Petitioner has the burden of establishing that the decision of the state court is contrary to or involved an unreasonable application of United States Supreme Court precedent. <u>Baylor v. Estelle</u>, 94 F.3d 1321, 1325 (9th Cir. 1996).  Although only Supreme Court law is binding on the states, Ninth Circuit precedent remains relevant persuasive authority in determining whether a state court decision is objectively unreasonable. See <u>LaJoie v. Thompson</u>, 217 F.3d 663, 669 (9th Cir.2000); <u>Duhaime v. Ducharme</u>, 200 F.3d 597, 600-01 (9th Cir.1999).

AEDPA requires considerable deference to the state courts. "[R]eview under § 2254(d)(1)

is limited to the record that was before the state court that adjudicated the claim on the merits," and "evidence introduced in federal court has no bearing on 2254(d)(1) review." Cullen v. Pinholster, __ U.S. __, __, 131 S.Ct. 1388, 1398-99 (2011).  "Factual determinations by state courts are presumed correct absent clear and convincing evidence to the contrary." Miller-El v. Cockrell, 537 U.S. 322, 340 (2003), *citing* 28 U.S.C. § 2254(e)(1).  However, a state court factual finding is not entitled to deference if the relevant state court record is unavailable for the federal court to review. Townsend v. Sain, 372 U.S. 293, 319 (1963), *overruled by,* Keeney v. Tamayo-Reyes, 504 U.S. 1 (1992).

III.    Review of Claims

   A.   Instructional Error - Cal. Penal Code § 416

   In his first claim for relief, Petitioner alleges the conspiracy instructions given, CALCRIM No. 416, allowed the jury to convict him of murder as a coconspirator based upon overt acts that occurred after the homicide.  He claims the trial court failed to give CALCRIM No. 419 *sua sponte*, which would have told the jury that a defendant could not be held responsible for acts done before he joined the conspiracy, and that evidence of acts or statements made before the defendant joined the conspiracy could not be considered to prove the defendant was guilty of crimes committed before he joined the conspiracy.

   Petitioner presented this claim on direct appeal to the Fifth DCA.  It was rejected in a reasoned decision on May 11, 2010. (See Lodged Doc. No. 4.)  Petitioner then presented the claim to the California Supreme Court in a petition for review.  The petition was denied without comment on September 1, 2010.  (See Lodged Doc. No. 6.)  When the California Supreme Court's opinion is summary in nature, the Court must "look through" that decision to a court below that has issued a reasoned opinion.  Ylst v. Nunnemaker, 501 U.S. 797, 804-05 & n. 3 (1991).  The Fifth DCA analyzed the claim as follows:

> Appellant contends his conviction must be reversed because the trial court's conspiracy instructions permitted jurors to convict him of murder based on overt acts that occurred after the homicide. We disagree that reversal is required.
>
> "'A conviction of conspiracy requires proof that the defendant and another person had the specific intent to agree to conspire to commit an offense, as well as the specific intent to commit the elements of that offense, together with proof of the commission of

an overt act "by one or more of the parties to such agreement" in furtherance of the conspiracy.'" (*People v. Lee* (2006) 136 Cal.App.4th 522, 528-529.) An overt act is an element of the crime of conspiracy "in the sense that the prosecution must prove it to a unanimous jury's satisfaction beyond a reasonable doubt. But that element consists of *an* overt act, not a *specific* overt act." (*People v. Russo* (2001) 25 Cal.4th 1124, 1134.)

A conspiracy usually ends when the substantive crime for which the co-conspirators are being tried is either attained or defeated. (*People v. Leach* (1975) 15 Cal.3d 419, 431.) The precise end of a conspiracy is a question of fact to be determined based on the nature and purpose of the conspiracy of each case. (*Ibid.*) Under the particular circumstances of a case, a conspiracy may extend beyond the substantive crime to activities contemplated and undertaken in pursuit of the objectives of the conspiracy. (*Ibid.*) However, acts to avoid detection and punishment committed after accomplishment of the criminal objective are not considered overt acts in furtherance of a conspiracy absent evidence that the conspiracy was still operative. (*Id.* at pp. 431-433; *People v. Zamora* (1976) 18 Cal.3d 538, 549, fn. 8., 551, 560.)

In this case, the trial court instructed the jury pursuant to Judicial Council of California Criminal Jury Instructions (2008), CALCRIM No. 416, in relevant part, as follows:

"The People have presented evidence of a conspiracy. A member of a conspiracy is criminally responsible for the acts or statements of any other member of the conspiracy done to help accomplish the goal of the conspiracy.

"To prove that the defendant was a member of a conspiracy in this case, the People must prove that:

"1. The defendant intended to agree and did agree with Joseph Lopez, Michelle Molina, Elbert Vargas, Sylvester Carter, or Maria Coronado to commit Murder....

"2. At the time of the agreement, the defendant and one or more of the other alleged members of the conspiracy intended that one or more of them would commit Murder....

"3. The defendant, or Joseph Lopez, Michelle Molina, Elbert Vargas, Sylvester Carter, or Maria Coronado, or all of them committed at least one of the following overt acts to accomplish Murder....

"- selected a victim;

"- obtained handcuffs;

"- obtained tape;

"- bathed the victim;

"- obtained a yellow towel

"- obtained plastic garbage bags;

"- cuffed and uncuffed the victim at various times;

"- disrobed the victim;

1    "- caused movement of the victim to different locations within the apartment;

2    "- killed or assisted in killing the victim;

3    "- obtained cleaning supplies and cleaned the apartment after removal of the
     victim's body from the apartment[;]

4

5    "- obtained a vehicle to dispose of the victim's body[;]

6    "- attempted to dispose of the victim's body[.]"

7         We conclude that any error in listing overt acts that occurred subsequent to the
     victim's murder was harmless beyond a reasonable doubt. The commission of the target
8    offense in furtherance of a conspiracy necessarily satisfies the overt act requirement.
     (*People v. Jurado* (2006) 38 Cal.4th 72, 121-122.) The trial court's instructions properly
9    defined an overt act and the other elements of conspiracy. By finding appellant guilty of
     murder, the jurors necessarily agreed that appellant, one of his alleged co-conspirators, or
     all of them, had committed such an act; i.e., "killed or assisted in killing the victim."

10

11        Appellant further contends the trial court erred in failing to instruct, sua sponte,
     with CALCRIM No. 419,[FN6] regarding appellant's liability for acts committed before he
12   joined the conspiracy. We reject appellant's contention because the substance of that
     instruction was already given in CALCRIM No 416, which relates that the requisite act
13   "must happen *after* the defendant has agreed to commit the crime." (Italics added.)

14        FN6. CALCRIM No. 419 provides: "(The/A) defendant is not responsible for any
          acts that were done before (he/ [or] she) joined the conspiracy. [¶] You may
15        consider evidence of acts or statements made before the defendant joined the
          conspiracy only to show the nature and goals of the conspiracy. You may not
16        consider any such evidence to prove that the defendant is guilty of any crimes
          committed before (he/ [or] she) joined the conspiracy."

17   (See Lodged Doc. No. 4.)

18   1.  CALCRIM No. 416

19        Petitioner claims the state court erred in instructing the jury in violation of his due

20   process rights.  The Supreme Court has held that the fact that an instruction was allegedly

21   incorrect under state law is not a basis for habeas relief. Estelle v. McGuire, 502 U.S. 62, 71

22   (1991), *citing* Marshall v. Lonberger, 459 U.S. 422, 438, n. 6 (1983) ("[T]he Due Process Clause

23   does not permit the federal courts to engage in a finely tuned review of the wisdom of state

24   evidentiary rules").  Federal habeas courts therefore do not grant relief simply because an

25   instruction may have been deficient. Estelle, 502 U.S. at 72.  The only question is "whether the

26   ailing instruction by itself so infected the entire trial that the resulting conviction violates due

27   process." Cupp v. Naughten, 414 U.S. 141, 147 (1973); see also Estelle, 502 U.S. at 72;

28   Henderson v. Kibbe, 431 U.S. 145, 154 (1977); Donnelly v. DeChristoforo, 416 U.S. 637, 643

8

(1974) ("'[I]t must be established not merely that the instruction is undesirable, erroneous, or even "universally condemned," but that it violated some [constitutional right]'"). "It is well established that the instruction 'may not be judged in artificial isolation,' but must be considered in the context of the instructions as a whole and the trial record." Estelle, 502 U.S. at 72, *quoting* Cupp v. Naughton, supra, 414 U.S., at 147. In addition, in reviewing the instruction, the court must inquire "whether there is a reasonable likelihood that the jury has applied the challenged instruction in a way" that violates the Constitution. Boyde v. California, 494 U.S. 370, 380 (1990). Even if constitutional instructional error has occurred, the federal court must still determine whether Petitioner's suffered actual prejudice, that is, whether the error "had substantial and injurious effect or influence in determining the jury's verdict." Brecht v. Abrahamson, 507 U.S. 619, 637 (1993).

In this case, the state court determined that the jury was erroneously instructed that it could find Petitioner guilty of murder as a coconspirator based on overt acts that occurred after the victim's death. However as set forth above, the court concluded that the error was harmless. The appellate court noted that in order to find Petitioner guilty of first degree murder, the jury necessarily concluded that Petitioner, his coconspirators, or all of them, had "killed or assisted in the killing of the victim." By concluding the Petitioner and/or his coconspirators had killed or assisted in killing the victim, the overt act requirement was satisfied notwithstanding the additional erroneously-included overt acts. There is no likelihood that the jury relied solely on an improper overt act to find Petitioner guilty of murder. Accordingly, there is no reasonable likelihood that the erroneous instruction had a substantial and injurious effect in determining the verdict. Brecht, 507 U.S. at 637. The instructional error does not rise to the level of a constitutional violation. The claim should be rejected.

2. CALCRIM No. 419

Petitioner further claims that the trial court compounded the instructional error above by failing to instruct with CALCRIM No. 419, which provides that a "defendant is not responsible for any acts that were done before he/she joined the conspiracy." Petitioner maintains that this failure permitted the jury to find Petitioner guilty of murder on a conspiracy theory for overt acts

9

1   that were committed before he joined the conspiracy.

2       The appellate court reasonably concluded that this argument lacks merit because the

3   substance of this instruction was already given in CALCRIM No. 416.  As pointed out by the

4   court, CALCRIM No. 416 explicitly required the jury to find that "[t]he overt act must happen

5   *after* the defendant agreed to commit the crime." (CT 1235.)  Thus, the state court reasonably

6   determined that the omission of CALCRIM No. 419 did not prejudice Petitioner in any way.

7   The claim should be denied.

8       B.   Comments by Trial Judge

9       Petitioner next claims that certain comments made by the trial judge concerning

10  reasonable doubt during jury selection reduced the prosecution's burden of proof in violation of

11  his constitutional rights.

12      This claim was also presented on appeal to the Fifth DCA where it was rejected in a

13  reasoned decision. (See Lodged Doc. No. 4.)  It was then presented to the California Supreme

14  Court in a petition for review, and the petition was denied without comment.  (See Lodged Doc.

15  No. 6.)  This Court must therefore "look through" to the decision of the appellate court. Ylst, 501

16  U.S. at 804-05 & n. 3.  The Fifth DCA analyzed and rejected the claim as follows:

17          In his next contention, appellant complains the trial court, during voir dire,
        "offered a variety of extemporaneous explanations of the most fundamental constitutional
18      concepts which misled the jury on the nature of reasonable doubt, and reduced the
        prosecution's burden of proof." Appellant argues the court's misinstruction on the
19      reasonable doubt standard constituted structural error and mandates reversal. We disagree
        and conclude none of the complained-of comments by the trial misinstructed the jury or
20      lightened the prosecution's burden.

21          "[T]he Due Process Clause protects the accused against conviction except upon
        proof beyond a reasonable doubt of every fact necessary to constitute the crime with
22      which he is charged." (In re Winship (1970) 397 U.S. 358, 364.) "The beyond a
        reasonable doubt standard is a requirement of due process, but the Constitution neither
23      prohibits trial courts from defining reasonable doubt nor requires them to do so as a
        matter of course. [Citation.] Indeed, so long as the court instructs the jury on the necessity
24      that the defendant's guilt be proved beyond a reasonable doubt [citation], the Constitution
        does not require that any particular form of words be used in advising the jury of the
25      government's burden of proof. [Citation.] Rather, 'taken as a whole, the instructions
        [must] correctly convey the concept of reasonable doubt to the jury.' [Citation.]" (Victor
26      v. Nebraska (1994) 511 U.S. 1, 5.) A trial court's use of a constitutionally-deficient
        reasonable doubt instruction is not subject to harmless error analysis. (Sullivan v.
27      Louisiana (1993) 508 U.S. 275, 279-282.)

28          When reviewing purportedly ambiguous jury instructions, we ask whether there is

a reasonable likelihood jurors applied the challenged instructions in a way that violated the Constitution. (*Estelle v. McGuire* (1991) 502 U.S. 62, 72; *People v. Welch* (1999) 20 Cal.4th 701, 766.) "The constitutional question in the present case[ ], therefore, is whether there is a reasonable likelihood that the jury understood the instructions to allow conviction based on proof insufficient to meet the *Winship* standard." (*Victor v. Nebraska, supra,* 511 U.S. at p. 6.) In making this determination, we must keep in mind that instructions are not considered in isolation. Instead, "[w]hether instructions are correct and adequate is determined by consideration of the entire charge to the jury" (*People v. Holt* (1997) 15 Cal.4th 619, 677), rather than by reference to "'"parts of an instruction or from a particular instruction."'"[Citations.]' [Citation.]" (*People v. Smithey* (1999) 20 Cal.4th 936, 963-964.)

A number of cases have found reversible error because the trial court's departure from the standard instruction on reasonable doubt effectively lowered the prosecution's burden of proof. For example, in the seminal case of *People v. Brannon* (1873) 47 Cal. 96, the California Supreme Court held it was error to instruct jurors that it was their duty to convict if they were " 'satisfied of the guilt of the defendant to such a moral certainty as would influence the minds of the jury in the important affairs of life.'" (*Id.* at p. 97.) The court held: "The judgment of a reasonable man in the ordinary affairs of life, however important, is influenced and controlled by the preponderance of the evidence. Juries are permitted and instructed to apply the same rule to the determination of civil actions involving rights of property only. But in the decision of a criminal case involving life or liberty, something further is required. There must be more than a preponderance of the evidence. There must be in the minds of the jury an abiding conviction, to a moral certainty, of the truth of the charge, derived from a comparison and consideration of the evidence. They must be entirely satisfied of the guilt of the accused." (*Ibid.*)

In *People v. Johnson* (2004) 119 Cal.App.4th 976, we found an unconstitutional lowering of the burden of proof where, during its questioning of and instructions to prospective jurors during voir dire, the trial court repeatedly equated proof beyond a reasonable doubt with everyday decisionmaking. (*Id.* at pp. 979-983, 985.)

In a case by the same name, *People v. Johnson* (2004) 115 Cal.App.4th 1169, Division One of the Second District Court of Appeal reached the same conclusion on similar facts, remarking, "We can all describe situations where people make serious decisions in spite of grave reservations about the outcome.... Such situations cannot be equated to the level of conviction necessary for finding guilt in a criminal case." (*Id.* at p. 1172.)

In *People v. Garcia* (1975) 54 Cal.App.3d 61, unconstitutional diminution of the prosecution's burden of proof was found where the trial court amplified the standard instruction on reasonable doubt by telling jurors that "'reasonable doubt means just what the term implies, doubt based upon reason, doubt that presents itself in the minds of reasonable people who are weighing the evidence in the scales, one side against the other, in a logical manner in an effort to determine wherein lies the truth.'" (*Id.* at p. 68, fn. omitted.) The appellate court found the "weighing" analogy to be "strikingly comparable" to the civil standard of proof by a preponderance of the evidence, whereas the "'weighing' process, where a tipping of the scales determines the 'truth,' is wholly foreign to the concept of proof beyond a reasonable doubt." (*Id.* at pp. 68-69.)

Relying primarily on our decision in *People v. Johnson, supra,* 119 Cal.App.4th 976, appellant contends the trial court reduced the prosecution's burden of proof by equating reasonable doubt to everyday decisionmaking activities, including cooking, shopping, reading a map, and assembling a jigsaw puzzle. We have reviewed the separate instances cited by appellant and, for a number of reasons, conclude there is no reasonable

likelihood the jury applied the complained-of comments in an objectionable way.

First, as appellant recognizes, the trial court correctly defined the reasonable doubt standard for prospective jurors several times during voir dire.[FN7] Second, we agree with respondent that, when viewed in context, the complained-of comments were not attempts by the trial court to describe the nature of reasonable doubt but "primarily dealt with explaining the process of applying the law to the facts." After correctly defining the reasonable doubt standard and describing the jury's role as fact finder, the court told prospective jurors that, at the end of the case, it would give the jury the law, which it likened to a "map" or "grid" that the jury would then place over the facts "to decide whether or not the People have proven that case beyond a reasonable doubt." We perceive nothing in the court's map analogy that trivialized the jury's task or lightened the prosecution's burden. The court essentially equated the jury instructions on the law with a map the jury would follow to determine whether its factual findings lined up with the legal elements on which it was instructed by the court. In employing the map analogy, the court did not suggest the prosecution's burden of proof was anything less than proof beyond a reasonable doubt.

FN7. Thus, the court told prospective jurors: "In a criminal case, a defendant is presumed to be innocent. This presumption requires the People to prove each element of a crime and any special allegation beyond a reasonable doubt. Until and unless this is done, the presumption of innocence prevails. Proof beyond a reasonable doubt is defined as follows: And this is part of the instruction that you'll hear at the end of this case, and should you sit as a juror. It is proof that leaves you with an abiding conviction that the charge is true. The evidence need not eliminate all possible doubt, because everything in life is open to some possible or imaginary doubt."

The same is true of the trial court's references to shopping, constructing a puzzle, and cooking. The court specifically told the prospective jury that reasonable doubt was *not* the standard people ordinarily apply when shopping or resolving disputes "[o]utside of these walls" but stressed it was nonetheless the standard the jury would be required to apply in the courtroom, and inquired into whether anyone had a problem with the standard, to which none of the prospective jurors responded. The court also stressed that the jury had to presume the defendant was innocent and that the prosecution was required to present evidence to overcome the presumption. The court likened the prosecution's task of overcoming the presumption of innocence to cooking or putting together a puzzle, and acknowledged that the parties would have different arguments and interpretations regarding what the evidence showed: "[F]inally at the end I give you a recipe, that's the law ... one party may say this meal ... has been served, the other party will say, no, it is this meal that has been served because you have all these ingredients. One party might argue that no, this is missing from that meal." Once again, we find nothing in the court's comments that misstated the reasonable doubt standard or lightened the prosecution's burden of proof. The other comments cited by appellant are sufficiently similar to the ones just discussed that we find it unnecessary to address them individually.

We also disagree with appellant's interpretation of several other comments by the trial court, which he claims told prospective jurors they could disregard defense evidence, implicitly denigrated his exercise of his right to a jury trial, and "encouraged the jury to rely on trivial or superficial information to assess credibility." When viewed in their proper context, none of the comments convey the meaning appellant suggests.

In response to one prospective juror's comment that he felt appellant should not be representing himself because of the disadvantageous position it placed him in, the trial court noted that, even if appellant never asked any questions, the burden was still on the

prosecution to prove appellant guilty. The court then used a hypothetical example of a defendant accused of running a red light, and explained that, even if the defense did nothing, the jury would still have to acquit the defendant if the prosecution failed to elicit testimony from the citing officer that the light was actually red at the time the defendant crossed the intersection. Nothing in the court's comments suggested the jury could, or should, disregard defense evidence, and therefore we reject appellant's interpretation.

In another comment cited by appellant, the trial court appears to have been simply commending the prospective jurors for honoring their "civil obligation" by attending jury duty and expressing appreciation for the important role juries play, including how often the prospect of a case going before a jury encourages litigants to settle. We do not infer from the court's comments any implicit criticism of appellant for exercising his right to a jury trial, and do not believe the prospective jurors would have understood the court's comments as such.

Later, when discussing prior jury service, a prospective juror described a civil case involving "a big dispute" between a landlord and tenant. In response, the court remarked, "Your jury came in and cleaned it up then?" We do not discern in the court's brief comment any suggestion to the prospective jurors that the court thought appellant was being irresponsible for exercising his right to a jury trial.

Lastly, appellant claims the trial court "encouraged the jury to rely on trivial or superficial information to assess credibility" and quotes the following comments by the court in his support of his claim:

"Common sense you can fit in, you can say, wow, the way that person said that, you know, he was chewing gum, he was spinning in his seat, you know, I'm going to give his, the weight and credibility I give him, on a scale of one to 10, whatever-however you do that-I'm going to give him some low marks for that because, I don't know, he didn't look me in the eye, eh was chewing gum and he was spinning around in the seat and just-I don't trust him. Anything like that. You know, whatever you decide." Our independent review of the record reveals that appellant has taken the above quotation out of a considerably longer commentary by the trial court, wherein the court correctly advised prospective jurors, possessing backgrounds in law enforcement, that it would be improper for them to rely on their personal experiences to evaluate the evidence. Thus, the court stated:

"You understand you could only rely on the evidence that's placed in the record; you can't go back and fill in gaps in evidence, if there were any. You just have to-if we were to print out what madam reporter is doing, all the testimony, that's your only basis for making a decision."

The court then made the comment cited by appellant. When viewed in context, the court's comments effectively told prospective jurors that, although they were barred from relying on their professional knowledge or experiences outside the courtroom in evaluating a witness's credibility, they could rely on their subjective impressions of the witness's conduct and demeanor inside the courtroom. The court's comments were legally correct and did not trivialize the jury's task. As the trial court properly instructed the jury under CALCRIM No. 226, one of the questions jurors could ask in evaluating a witness's testimony was "What was the witness's behavior while testifying?"

In short, we disagree with appellant's interpretations of the trial court's comments, and conclude that none misstated the reasonable doubt standard, lightened the prosecution's burden of proof, or otherwise deprived appellant of his rights to due process and a fair trial.

13

(See Lodged Doc. No. 4.)

As noted by the appellate court, the Due Process Clause of the Fourteenth Amendment "protects the accused against conviction except upon proof beyond a reasonable doubt of every fact necessary to constitute the crime with which he is charged." In re Winship, 397 U.S. 358, 364 (1970). The United States Supreme Court has held that "the Constitution does not require that any particular form of words be used in advising the jury of the government's burden of proof. Rather, taken as a whole, the instructions must correctly convey the concept of reasonable doubt to the jury." Victor v. Nebraska, 511 U.S. 1, 5 (1994). A jury instruction that reduces the level of proof necessary for the Government to carry its burden "is plainly inconsistent with the constitutionally rooted presumption of innocence." Cool v. United States, 409 U.S. 100, 104 (1972). "All challenged instructions[, however,] must be considered in light of all of the jury instructions and the trial record as a whole." Mendez v. Knowles, 556 F.3d 757, 768 (9th Cir.2009), citing Cupp v. Naughten, 414 U.S. 141, 146–47 (1973).

In this case, it is clear that none of the challenged comments by the trial judge could have been misunderstood by the jury so as to reduce the prosecution's burden. The map analogy used by the judge merely analogized the jury instructions on the law with a map the jury would follow to determine whether its factual findings met the legal elements on which it was instructed by the court. There was no suggestion that the prosecution's burden was anything less than reasonable doubt. Likewise, the trial judge's comments regarding shopping, constructing a puzzle, and cooking did not trivialize the jury's role. On the other hand, the judge used these references to illustrate that the standard of "reasonable doubt was *not* the standard people ordinarily apply" in their daily lives. (See Lodged Doc. No. 4.) The judge's use of the hypothetical of running a red light did not suggest disregarding defense evidence as Petitioner maintains; rather, it informed the jury that the prosecution must still carry its burden of proving Petitioner guilty beyond a reasonable doubt. In another comment, the judge praised a juror's prior jury service. This comment did not, in any way, chastise Petitioner for exercising his right to jury trial. As to the judge's brief comment about a juror's prior service on a civil case, the appellate court reasonably found no suggestion that the court thought Petitioner was being irresponsible for exercising his

14

1  jury trial rights.  Finally, the state court reasonably determined that the trial court's comments

2  regarding common sense in evaluating a witness' credibility and demeanor "were legally correct

3  and did not trivialize the jury's task." (See Lodged Doc. No. 4.)

4      Moreover, it must be noted that the challenged comments by the trial court were made

5  during voir dire.  Once the venire was empaneled, the jurors were pre-instructed on the definition

6  of reasonable doubt pursuant to CALCRIM No. 103. (CT 1199.)  Then, at conclusion of

7  presentation of the evidence, the jury was formally instructed on all applicable instructions,

8  including again, the definition of reasonable doubt in CALCRIM No. 220. (CT 1166, 1207.)

9  Any possible erroneous statement made during voir dire could not have had a substantial and

10  injurious effect on the verdict. Brecht, supra, 507 U.S. at 637-38.

11      In sum, the state court rejection of Petitioner's claim was neither contrary to, nor an

12  unreasonable application of, clearly established law as established by the Supreme Court.  28

13  U.S.C. § 2254(d).  The claim must be rejected.

14      C.  Shackling

15      In his next claim, Petitioner contends his rights to self-representation, due process and a

16  fair trial were violated when he was shackled during his trial.

17      As with the previous claims, this claim was presented on appeal to the Fifth DCA where

18  it was rejected in a reasoned decision. (See Lodged Doc. No. 4.)  It was then presented to the

19  California Supreme Court in a petition for review, and the petition was denied without comment.

20  (See Lodged Doc. No. 6.)  This Court must therefore "look through" to the decision of the

21  appellate court. Ylst, 501 U.S. at 804-05 & n. 3.  The appellate court denied the claim as follows:

22          Appellant contends the trial court abused its discretion and committed prejudicial
           error by requiring him to be shackled during trial. We find appellant's arguments
23          unpersuasive.

24          Based on "possible prejudice in the minds of the jurors, the affront to human
           dignity, the disrespect for the entire judicial system which is incident to unjustifiable use
25          of physical restraints, as well as the effect such restraints have upon a defendant's
           decision to take the stand," the Supreme Court has reaffirmed the rule "that a defendant
26          cannot be subjected to physical restraints of any kind in the courtroom while in the jury's
           presence, unless there is a showing of a manifest need for such restraints." (People v.
27          Duran (1976) 16 Cal.3d 282, 290-291, fn. omitted (Duran ).)

28          The decision to shackle a defendant is within the discretion of the trial court and

15

will be upheld by a reviewing court in the absence of an abuse of discretion. (*People v. Cunningham* (2001) 25 Cal.4th 926, 987 (*Cunningham*).) "The imposition of physical restraints in the absence of a record showing of violence or a threat of violence or other nonconforming conduct will be deemed to constitute an abuse of discretion." (*Duran, supra,* 16 Cal.3d at p. 291.)

Evidence of nonconforming conduct that will support shackling is not limited to escapes or acts of violence in the courtroom. (*People v. Hawkins* (1995) 10 Cal.4th 920, 944 (*Hawkins* ), overruled on other grounds in *People v. Blakely* (2000) 23 Cal.4th 82, 89.) In *Hawkins,* the defendant's three fist fights in prison and his extensive criminal history was sufficient to justify shackling. (*Hawkins, supra,* at p. 944.) In *Cunningham, supra,* 25 Cal.4th 926, 988, restraints were properly ordered despite the absence of violent conduct by the defendant during prior court appearances where the defendant had deliberately obtained a key to his handcuffs and the courtroom had no lock.

We find no abuse of discretion in the instant case as the record shows violence and other nonconforming conduct by appellant. In ruling on appellant's motion to appear without physical restraints, the trial court considered, inter alia, a report prepared by the Fresno County Sheriff's Department Court Security Unit, documenting that "[appellant] ha[d] been involved in *twenty-three* separate incidents of *Non-Conforming, Disruptive* behavior, some of which involved fighting and assaults, in the Jail while in custody since May 2006" [FN3] and finding that "he pose[d] a *very real and serious security threat* to officers, court personnel and the public if appropriate security measures are not ensured during this trial."

FN3. Appellant's trial testimony showed that in May 2006, he was in prison on a parole violation. He had just been released on June 7, 2006, when he met up with codefendants Lopez and Vargas, whom he had met while in prison.

Significantly, the report reflected that just three weeks before the hearing on appellant's motion to appear without physical restraints, deputies received information that appellant "may have a jail made weapon hidden in the light fixture of his cell." The subsequent search of appellant's cell revealed the presence of "two exposed razor blades" on the bedrail and confirmed tampering with the light fixture ("The top two screws were found to be broken off at the nuts and a piece of folded up card board was found taped to the inside of the light fixture."). The record is more than adequate to justify the use of restraints without considering the contested evidence of whether appellant resisted being brought to court on one occasion. Evidence that appellant secreted weapons in his cell and was violent and threatening towards other inmates provided sufficient justification for requiring the use of physical restraints.

Relying on *People v. Burnett* (1980) 111 Cal.App.3d 661 (*Burnett*), appellant contends the trial court failed to give due consideration to the effect the restraints would have on his ability to represent himself. In *Burnett,* a pro per defendant was shackled so he could not leave his chair during trial and the appellate court reversed. *Burnett* is distinguishable because, there, the court found an insufficient basis for restraining as the order was based on the defendant's criminal history and a seven-year-old escape conviction. (*Id.* at p. 667.) As discussed above, here, the record amply supported restraining appellant due to numerous instances of violent and nonconforming behavior while he was in custody. Because the trial court did not abuse its discretion in ordering appellant to be physically restrained during the trial, we are not required to consider the prejudicial effects of the restraints on appellant's ability to represent himself. (See *id.* at p. 669 ["Having concluded that the court erred in restraining appellant, we must determine whether the error was prejudicial"].) We note, however, that, unlike the defendant in *Burnett,* appellant elected to testify on his own behalf and therefore the possibility the use

of restraints inhibited the exercise of his right to testify is not present in this case. (See *id.* at p. 670.)

We also reject appellant's suggestion the trial court abused its discretion because it had a general policy of requiring all inmate witnesses to testify in shackles. While such a blanket policy would be improper (see *People v. Ceniceros* (1994) 26 Cal.App.4th 266, 278), the record demonstrates the trial court did not require appellant to be shackled simply as a matter of policy but made an individualized determination of manifest need based on a proper evidentiary showing. Moreover, to the extent any other inmate witnesses were required to testify in shackles under an improper blanket policy, appellant has failed to demonstrate he was prejudiced as a result.

Appellant also contends the trial court erred by failing to instruct the jury, sua sponte, that the restraints should have no bearing on the determination of his guilt. Such an instruction is required in cases in which the restraints are visible to the jury. (*Duran, supra,* 16 Cal.3d at pp. 291-292.) "However, when the restraints are concealed from the jury's view, this instruction should not be given unless requested by defendant since it might invite initial attention to the restraints and thus create prejudice which would otherwise be avoided." (*Id.* at p. 292, fn. omitted .)

As appellant recognizes, the trial court took measures to conceal his restraints from the jury's view. Appellant nonetheless argues it was "highly likely that the jury was aware that appellant was shackled" and asserts the trial court improperly "refus[ed] to make a record regarding the jury's awareness that appellant was shackled."

Appellant's characterization of the record is inaccurate because the trial court did not refuse to question the jurors about their knowledge of whether he was shackled but reserved the issue until after the court addressed whether possible juror misconduct had occurred. The question of possible juror misconduct arose after the court's judicial assistant advised the court she had overheard jurors expressing frustration with how the defense case was being presented and suggesting they knew appellant was either shackled or in custody. Appellant argued it was misconduct for jurors to converse with each other about the case and asked the court to inquire into how long they had known he was in custody. The prosecutor observed that the issue of whether appellant was in custody would shortly become moot since the parties were to stipulate that appellant had been in custody since his arrest on June 21, 2006.[FN4] The court agreed with the prosecutor and told appellant it would not question the jurors about whether they knew he was in custody but would reserve the issue.

> FN4. The records shows that immediately before the discussion of possible juror misconduct, the prosecution had tentatively agreed to enter a stipulation that appellant had been in custody since his arrest on the current charges on June 21, 2006. Appellant, who had asked defense witness Laurie Lopez about her knowledge of his prior convictions for stealing and being in possession of a stolen vehicle, had expressed concern the jury might infer he stole a vehicle after the events underlying the current charges. In this regard, the stipulation would show appellant "did not have the ability to steal a vehicle from June 21st, to today's date, because [he was] in custody."

After questioning each juror individually about whether anybody had improperly engaged in deliberations or discussed the merits of the case, the trial court determined that no misconduct had occurred and that the jurors' comments to one another had simply centered on the slow "pacing" of the defense case. The trial court then asked the parties whether they had anything further, and appellant said, "no." On this record, appellant has not demonstrated the trial court improperly refused to make a record or instruct the jury

regarding appellant's physical restraints because the court expressly reserved the issue and appellant did not pursue the matter any further. Because appellant did not request an instruction and there is no evidence the jurors were able to see appellant's physical restraints, the court was not under a sua sponte duty to instruct the jury to disregard the restraints in determining his guilt and we reject appellant's arguments to the contrary.

Lastly, appellant claims his shackling deprived him of the right to represent himself under *Faretta v. California* (1975) 422 U.S. 806 (*Faretta* ), a structural error which requires reversal per se. (See *McKaskle v. Wiggins* (1984) 465 U.S. 168, 177, fn. 8; *People v. Joseph* (1983) 34 Cal.3d 936, 948.) In this case, however, there is no *Faretta* error. There is no basis for concluding that the restraints compromised appellant's ability to voir dire prospective jurors, to make his opening and closing statements, to lodge objections, and to question witnesses.

The incident appellant cites, in which his investigator had difficulty using the overhead projector to display certain phone records appellant had highlighted, does not demonstrate appellant's right to represent himself was violated. Appellant asserts that, had he not been shackled, he could have simply pointed to the numbers he wanted to highlight on the overhead projector. But appellant has made no showing that he could not have asked his investigator to point to the numbers and thus highlight them for him. Indeed, it appears the trial court was open to allowing such demonstrations. For example, in one discussion, during which appellant expressed concern shackling would prevent him from demonstrating to the jury how, at one point, he saw Rice "slumped" against the wall in Molina's apartment, the trial court suggested appellant have his investigator lie down to make the demonstration for him. Moreover, it appears, on the whole, the defense investigator was able to use the overhead projector successfully to help appellant present his case.

On this record, we find no support for appellant's assertions that the use of physical restraints deprived him of due process, a fair trial, or his right to self-representation.

(See Lodged Doc. No. 4.)

The Supreme Court has held that "the Fifth and Fourteenth Amendments prohibit the use of physical restraints visible to the jury absent a trial court determination, in the exercise of its discretion, that they are justified by a state interest specific to a particular trial." Deck v. Missouri, 544 U.S. 622, 629 (2005). "Such a determination may of course take into account the factors that courts have traditionally relied on in gauging potential security problems and the risk of escape at trial." Id.

In this case, the trial court conducted a hearing on Petitioner's motion to appear a trial without restraints. (CT 1072.) The court considered an 18-page report from the Fresno County Sheriff's Department which concluded that Petitioner "poses a very real and serious threat to officers, court personnel and the public if appropriate measures are not ensured during this trial."

(SCT[3] 46-63.)  The report noted that Petitioner had a lengthy arrest and conviction record, and

had served extensive periods of time in prison, jail, and the Youth Authority. (SCT 46.)  The

report further noted that Petitioner had been involved in 23 separate incidents of non-conforming,

disruptive behavior, including fighting and assaults while in custody. (SCT 46-47.)  In addition,

he was a self-admitted validated gang member. (SCT 46-47.)  The report also noted an assault

committed by Petitioner on a staff member in a court holding area on February 21 or 22, 2008, as

well as a disrespectful communication by Petitioner with a courtroom deputy on February 14,

2008. (SCT at 52-54.)

The trial court considered all of the above information and personally recalled hearing the

incident on February 14 and hearing about the incident on February 22. (RT 97.)  The trial court

concluded that physical restraints were necessary for the safety of court personnel and the public;

however, the trial court allowed Petitioner to be unshackled during jury selection and determined

that during trial a physical restraint would be attached to Petitioner's leg which could not be

heard or seen by the jury.  (RT 110-111; 2162-64.)  When the time came for Petitioner to testify,

he would be seated in the witness stand prior to the jury's return, and his legs would be shackled

together out of the sight of the jury. (RT 1614.)  Petitioner agreed with this procedure rather than

having additional deputies situated in the courtroom. (RT 1615.)

Given Petitioner's history of violent behavior including incidents leading up to trial, the

trial court's decision to permit physical restraint was not based on an unreasonable determination

of fact, and Petitioner has not established a violation of clearly established law.  Moreover, the

physical restraints utilized were not visible to the jury, so Petitioner could not have suffered any

prejudice.  The claim should be rejected.

D.   Question/Answer Format

Petitioner next alleges the artificial question and answer format of his testimony

impermissibly burdened his right to testify in violation of his constitutional rights.

This claim was also presented on direct appeal and rejected by the state courts.  The Fifth

---

[3]"SCT" refers to the Supplemental Clerk's Transcript on Appeal.

DCA rendered the last reasoned decision, as follows:

> Next, appellant complains the trial court impermissibly burdened his right to testify by requiring him to testify in a question/answer format rather than in a narrative format. We disagree.
>
> Before appellant took the stand, the trial court discussed the question/answer format he should use during his testimony:
>
> "[APPELLANT]: Do I say 'question'?
>
> "THE COURT: Yes.
>
> "[APPELLANT]: Wow.
>
> "THE COURT: Because we start saying, 'and after that,' you know, 'you did this and that, and that; isn't that right?' And then you might be-you'll get into a narrative, and then he won't know when the narrative-when the question ends and when the narrative begins where he interposes his objection, motion to strike. What's he going to strike? What portion is he going to ask me to strike? Because we need to make an accurate record here. And I won't know where the question ends and where the answer begins. So it's pretty straight forward questioning: 'Answer, question.' Will it seem corny?
>
> "[APPELLANT]: Yeah.
>
> "THE COURT: Don't worry about that.
>
> "[APPELLANT]: Can you at least tell the jury that that's how it's supposed to go and that's how it has to be because I don't want them to think, you know, like I'm a nut case.
>
> "THE COURT: Yeah-well, they'll figure it out. But I'll say that, I'm going to say, you know, Mr. Alley represents himself, he's calling himself as a witness, and in that regard, so as to assist the Court and the jury, he's going to preface his questions with the word 'question' before he asks it, and before he answers it he's going to say 'answer'. And that will help us make a record. And he's been so advised to do that. [¶] Any objections to that?
>
> "[THE PROSECUTOR]: No, I have no objection.... [¶] ... [¶] As to the format here, I think that's probably the best format, because jurors are somewhat sophisticated in today's media and they understand that if somebody gets up there and testifies in a narrative, there's an issue as to whether the testimony is truthful or not. We all are aware that if an attorney knows that they're going to putting [*sic*] on testimony that's not truthful, their client just takes the stand and just starts talking, and it's the unspoken rule, but given the popularity of legal shows in the field, we're all pretty well established that a person taking the stand, giving a narrative, there's something wrong with that-
>
> "THE COURT: Right. So that's why you've got to pretend like you're asking another person questions, you know, 'And what did you do next, sir.' 'Answer.' As best you can. And if he makes the objection, I'll wait to hear the objection."
>
> Before appellant testified, the trial court admonished the jury as follows:

20

"Ladies and gentlemen, the way we'll proceed in this matter is, in a moment after I finish speaking, Mr. Alley will stand and be sworn in by madam clerk, and the process is that he'll preface each question with the word 'question,' followed by the question, and 'answer,' followed by his answer, and so on and so forth. And it just helps us make a more accurate record. It may seem a little bit odd, but it just helps make a clear record for madam reporter, and if somebody were to read this record hours, days, months from now."

"The rule is well settled that whether a witness shall be permitted to testify in a narrative form instead of by questions and answers, is a question for the trial court's sound discretion, and unless prejudice is shown no abuse of discretion can be found. [Citation.] Neither the record nor the appellant's brief indicates prejudice flowing from the form of direct examination the trial court countenanced." (*People v. Belcher* (1961) 189 Cal.App.2d 404, 407-408.)

We have reviewed appellant's testimony and find that any disruption caused by the trial court's reminders to appellant to abide by the question/answer format was minimal. In fact, there were a number of occasions when the court did not interrupt appellant even though appellant had failed to say "question" or "answer" before a statement. Contrary to his assertions on appeal, the format did not appear to confuse appellant or disrupt his concentration to the point that it interfered with his ability to present his case or testify on his own behalf. Rather, the record reflects appellant handled the presentation of his testimony with surprising skill, even reminding himself on one occasion, without prompting, not to testify to others' statements because they would constitute hearsay.[FN5] The record simply does not support appellant's assertions that the question/answer format required by the trial court was unduly burdensome or interfered with his ability to testify or present his defense.

FN5. For example, appellant testified as follows: "Question: What did you do next? [¶] Answer: It was my understanding to get out of the car and go and collect Michelle Molina. [¶] Question: You do understand that you can't say anything that other people said because it's considered hearsay? [¶] Answer: Yes, I do understand that. [¶] Question: When-did you get out of Maria Coronado's vehicle? [¶] Answer: Yes. [¶] Question: What did you do? [¶] Answer: I walked towards the breezeway in between apartments 212, 211, 111, and 112.[¶] Question: Did you see anything as a result? [¶] Answer: Yes. [¶] Question: What was that? [¶] I seen-Michelle Molina and Elbert Vargas coming from the back of the apartment building."

We also disagree with appellant's characterization of the record when he suggests the trial court imposed the question/answer format merely for the convenience of the prosecutor and the court reporter. The discussion quoted above shows the trial court was legitimately concerned with the accuracy of the record and the possibility the jury would infer appellant was lying if he testified in a narrative format. Moreover, the court admonished the jury concerning the questioning format at appellant's request.

On the forgoing record, appellant has demonstrated no abuse of discretion by the trial court or prejudice resulting from his not being permitted to testify in a narrative format.

(See Lodged Doc. No. 4.)

It is well-established that "a defendant in a criminal case has the right to take the witness stand and to testify in his or her own defense." Rock v. Arkansas, 483 U.S. 44, 49 (1987); see

1  also Faretta v. California, 422 U.S. 806, 819, n.15 (1975).  However, "the right to present

2  relevant testimony is not without limitation. The right 'may, in appropriate cases, bow to

3  accommodate other legitimate interests in the criminal trial process.'" Rock, 483 U.S. at 55,

4  *quoting* Chambers v. Mississippi, 410 U.S. 284, 295 (1973).  "But restrictions of a defendant's

5  right to testify may not be arbitrary or disproportionate to the purposes they are designed to serve.

6  In applying its evidentiary rules a State must evaluate whether the interests served by a rule

7  justify the limitation imposed on the defendant's constitutional right to testify." Rock, 483 U.S. at

8  55-56.

9        In this case, as discussed by the appellate court, Petitioner was required to testify in a

10  question/answer format.  Although the format may have been somewhat awkward for Petitioner,

11  the trial court had good reason to disallow a narrative format.  As noted by the appellate court,

12  the trial court was legitimately concerned with the accuracy of the record and the possibility that

13  the jury would infer Petitioner was lying if he provided a narrative.  As to Petitioner's concern

14  that this format of questioning would cause the jury to view him as suffering from a mental

15  disorder, his concerns were negated by the trial court's instruction to the jury that Petitioner was

16  being required to testify in this manner.  Moreover as noted by the appellate court, the disruption

17  caused by the question and answer format was minimal, and there was no evidence that

18  Petitioner was unable to handle the presentation of evidence using this format.  In fact, the court

19  concluded that Petitioner handled the presentation of his testimony with surprising skill.

20        In sum, the state court rejection of the claim was not contrary to, or an unreasonable

21  application of, controlling Supreme Court precedent.  The claim should be denied.

22        E.   Marsden[4] Motions

23        In his last claim for relief, Petitioner contends he was denied his right to counsel in

24  violation of the Sixth Amendment as a result of the trial court's multiple denials of Petitioner's

25  Marsden motions over the course of his first trial.

26        This claim was also presented on direct appeal and rejected by the state courts.  The Fifth

27

28        [4]People v. Marsden, 2 Cal.3d 118 (1970).

1    DCA rejected the claim as follows:

2        Initially, we observe that the propriety of the trial court's rulings denying
     appellant's *Marsden* motions in his first trial is not an issue that is properly before us in
3    this appeal from the judgment following appellant's second trial. To the extent appellant
     was seeking representation by different counsel in his second trial, it was incumbent on
4    him to assert proper grounds therefor. It is clear from the record that appellant was not
     seeking new counsel but was seeking to represent himself. He specifically filed a *Faretta*
5    motion for self-representation and argued to the trial court why he felt he should represent
     himself. Because appellant was moving for self-representation, not new counsel, the court
6    was not required to hold a *Marsden* inquiry.

7    (See Lodged Doc. No. 4.)

8        Respondent correctly argues that this claim is moot.  The case or controversy requirement

9    of Article III of the Federal Constitution deprives the Court of jurisdiction to hear moot cases.

10   Iron Arrow Honor Soc'y v. Heckler, 464 U.S. 67, 70 (1983); NAACP., Western Region v. City

11   of Richmond, 743 F.2d 1346, 1352 (9th Cir. 1984).  A case becomes moot if the "the issues

12   presented are no longer 'live' or the parties lack a legally cognizable interest in the outcome."

13   Murphy v. Hunt, 455 U.S. 478, 481 (1984).  The Federal Court is "without power to decide

14   questions that cannot affect the rights of the litigants before them." North Carolina v. Rice, 404

15   U.S. 244, 246 (1971) (per curiam), *quoting* Aetna Life Ins. Co. v. Hayworth, 300 U.S. 227, 240-

16   241 (1937).  A limited exception is provided where the issue is "capable of repetition" while

17   "evading review" and generally requires a "reasonable showing" that the complaining party "will

18   again be subjected to the alleged illegality." Los Angeles v. Lyons, 461 U.S. 95, 109 (1983).

19       The Marsden motions Petitioner challenges were raised and decided during his first trial.

20   That trial ended with a hung jury on two counts and acquittals on two others.  Petitioner did not

21   raise any Marsden motions during his second trial.  Even assuming the trial court's Marsden

22   rulings during the first trial constituted constitutional error, the remedy for the alleged error

23   would be a second trial which Petitioner has already received.  Insofar as Petitioner represented

24   himself in the second trial and no Marsden motions were raised, Petitioner was not subjected to

25   the same alleged error again.  Thus, there is no "live controversy" and the claim should be

26   dismissed as moot. See, e.g., Lambrix v. Singletary, 72 F.3d 1500, 1508 (11th Cir.1996) ("Even if

27   we concluded that Lambrix was denied his right to testify during his first trial, the appropriate

28   remedy would be to grant a new trial. [Citation.] Therefore, because Lambrix has already

                                        23

received a second trial, this issue is moot.").

## RECOMMENDATION

Accordingly, the Court HEREBY RECOMMENDS that this action be DENIED WITH PREJUDICE.

This Findings and Recommendation is submitted to the Honorable Lawrence J. O'Neill, United States District Court Judge, pursuant to the provisions of 28 U.S.C. § 636 (b)(1)(B) and Rule 304 of the Local Rules of Practice for the United States District Court, Eastern District of California. Within thirty (30) days after service of the Findings and Recommendation, any party may file written objections with the court and serve a copy on all parties. Such a document should be captioned "Objections to Magistrate Judge's Findings and Recommendation." Replies to the objections shall be served and filed within fourteen (14) days after service of the objections. The Court will then review the Magistrate Judge's ruling pursuant to 28 U.S.C. § 636(b)(1)(C). The parties are advised that failure to file objections within the specified time may waive the right to appeal the District Court's order. Martinez v. Ylst, 951 F.2d 1153 (9th Cir. 1991).


IT IS SO ORDERED.

**Dated:   March 28, 2012        /s/ Gary S. Austin**
UNITED STATES MAGISTRATE JUDGE